**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **WILLIAM HARDY** | **CIVIL ACTION NO. 09-3189** |
| **VERSUS** | |
| **SHELL OIL COMPANY** | **SEC. 1, MAGISTRATE 4** |
| **AND** | |
| **SHELL CHEMICAL LP** | **JURY DEMAND** |

**MEMORANDUM IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes plaintiff, William Hardy, who respectfully submits the following Memorandum in Opposition to Shell's Motion for Summary Judgment.

**FACTS**

Bill Hardy began his employment with Shell Chemical LP (Shell) in October, 1989, as a senior engineer. PEx #1. At the time he had 14 years experience in the field in addition to a Bachelor of Science degree in Chemistry and a Master of Science degree in Analytical Chemistry. Id. From the beginning of his employment up until approximately 1995, plaintiff was responsible for the analyzers located both at the chemical plant and at the refinery. PEx #2, p. 73. Around 1995, and until his termination in 2008, plaintiff remained responsible for the analyzers on the chemical side only, due to a plant restructure. Id., pp. 73-74. Plaintiff started his employment at a Grade 4 level, and was promoted to a Grade 3 level in 1998. Id, pp. 113-114. The grade change was accompanied by a salary increase. Id.

1

In 2004, Tammy Little became plaintiff's supervisor.  PEx #2, p. 119.  Ms. Little was 35 years old at the time, while plaintiff was 55.  Id, p. 7; PEx #3, p. 15.  Bill Hardy reported directly to Ms. Little for a few months, after which the new supervisor reorganized the entire department to meet management's technical knowledge, or lack thereof:

> Q.    What were the things going on that you referred to?
> A.    What happened is they were grouping people together multiple disciplines underneath a single supervisor and the thing that was most concerning to me was that I had a new manager Kyle Cunningham, who was responsible for multiple different disciplines, people who were basically less than five years of experience, but he's a chemical engineer background Process Engineer, and so having either a Control Systems or a Pressure Equipment person reporting to him, he didn't understand the specifics of their discipline enough to really give them good guidance.
>
> To the sake token, I was responsible as the Technology Manager for all of the disciplines and there were several individual contributors who were reporting to me and it made it very difficult for me to keep that high level view. I had actual managers underneath me who had parts of a discipline but then there were some people who were reporting directly to me and I just cleared that up because one of the things that I came in to work on early on was the accountability piece, and having these people who were not clear who was responsible for what discipline, it was just very confusing so I elected to clear that up.

PEx #3, pp. 11-12.  As a result of Tammy Little's reorganization, plaintiff was moved to report to Don Fowler who, in turn, reported to Ms Little.  PEx ##2 (pp. 131-132), 3(p. 14).   Plaintiff reported to Mr. Fowler for approximately two years, when the latter transferred to Houston.  PEx #3, p. 15.  Consequently, Shell hired Susanne Karst to

replace plaintiff's supervisor.   Id.   Ms. Karst had no experience in Control Systems Engineering, the very field she was hired to manage.  Id., p. 178.  She became plaintiff's supervisor in January, 2007.  Id., p. 17.  She was around her early 40's at the time.  Id, p. 19.   Plaintiff's job became extremely difficult shortly thereafter.   PEx #2, p. 174. It continued so from March, 2007, until April, 2008, when he was terminated allegedly due to a history of poor work performance.    Rec. Doc. 30-2, p. 2.  The evidence, however, shows that defendant imposed upon plaintiff unreasonable tasks and unreasonable deadlines, unlike those required of similarly situated younger employees.  The evidence also shows that Shell began freezing the benefits of older employees and targeting employees that were close to the retirement age.  Further evidence shows that Shell had a reputation for retaliating against its employees, and that Susanne Karst expected plaintiff to take her discipline at face value and not challenge it.  Defendant's acts were in violation of the Age Discrimination in Employment Act (ADEA) and in retaliation for plaintiff's complaints regarding same.

## **LAW AND ARGUMENT**

### **1.  Standard on summary judgment.**

A motion for summary judgment must be granted only if "…the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  F.R.C.P. 56.  "In making this determination, we view all of the evidence and inferences drawn from that evidence in the light most favorable to the party opposing the motion for summary judgment."

*Hibernia National Bank v. Carner*, 997 F.2d 94, 97 (5th Cir.1993)*, citing *Reid v. State Farm Mutual Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).   A dispute is genuine when "…the evidence shows that a reasonable jury *could* return a verdict for the non-moving party…."  *Carner,* supra, at 98, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  "…[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."   *Anderson,* supra, at 477 U.S. 248-249.   Testimony based on conjecture or speculation is insufficient to raise an issue of fact to defeat a summary judgment motion because "…there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id., at 477 U.S. 249-250 (citations omitted).  Plaintiff does not have to offer a confession on the part of the defendant in order to prove his case.  *Burns v. Texas City Refining, Inc.*, 890 F.2d 747, 751 (5th Cir. 1989).

Summary judgment may be granted in the absence of a genuine issue of material fact.   However, "…summary judgment is not favored in claims of employment discrimination…."   *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 190-191 (5th Cir. 2001), citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1164 (5th Cir. 1993).  In reviewing a motion for summary judgment "…the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial." *Anderson*, supra, at 477 U.S. 249.


### 2.   Shell discriminated against Bill Hardy because of his age

Plaintiff has met his prima facie case of age discrimination

At page 12 and 13 of its Memorandum in Support, Shell claims that plaintiff was

not replaced when he was terminated.   Rec. Doc. 30-2, pp. 12-13.   This is no deal

breaker:

> However, it is well settled that, although replacement with
> a non-member of the protected class is evidence of
> discriminatory intent, it is not essential to the establishment
> of a *prima facie* case under Title VII. *See Hornsby v.*
> *Conoco, Inc.*, 777 F.2d 243, 246 (5th Cir. 1985) ("This
> court has previously held that the single fact that a plaintiff
> is replaced by someone within the protected class does not
> negate the possibility that the discharge was motivated for
> discriminatory reasons").

*Williams v. Trader Publ'g Co.*, 218 F.3d 481, 485 (5th Cir. 2000).   Furthermore, this

particular prima facie element can be satisfied by a showing that similarly situated

employees outside of his protected class received more favorable treatment.   *Barbe v.*

*A.A. Harmon & Co.*, 705 So.2d 1210 (La.App. 4 Cir. 1998), *writ denied,* 719 So.2d 462

(La. 1998).   Shell claims that Vance Grieshop and Bill Green, two younger employees

plaintiff compares himself to, are also within the protected class, wherein they were 45

and 48 years old, respectively, at the time of plaintiff's termination.   Memorandum in

Support pp. 5, 13, Rec. Doc. 30-2.   Defendant against relies on the wrong standard.   "To

demonstrate age discrimination a plaintiff must show that (1) he was discharged; (2) he

was qualified for the position; (3) he was within the protected class at the time of

discharge; and (4) he was either i) replaced by someone outside the protected class, ii) **replaced by someone younger, or iii) otherwise discharged because of his age.**" *Rachid v. Jack in the Box, Inc*., 376 F.3d 305, 309 (5th Cir. 2004) (emphasis added).  A similarly situated employee need not be outside the protected class, but only considerably younger:

> In the age-discrimination context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.

*Baiamonte v. Sizeler Real Estate Mgmt. Co*., 1997 U.S. Dist. LEXIS 105 (E.D. La. Jan. 3, 1997).  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433, (1996).  *Baimonte,* supra, at 8, denied summary judgment on an age discrimination claim, where the replacement was nine years younger than the plaintiff.  *O'Connor*, *supra,* at 517 U.S. 313, found that a 16-year age difference was sufficient.  Bill Hardy was 59 years old at the time of his termination, 14 years older than Mr. Grieshop, and 11 years older than Mr. Green.  Thus, the similarly situated employees were considerably younger than plaintiff for purposes of his prima facie case.   In addition, plaintiff's supervisor and executioner, Susanne Karst, was herself in her early 40's at the time she terminated plaintiff, thus approximately 15-17 years younger than Mr. Hardy.   Tammy Little, second line supervisor, is 20 years younger than plaintiff, and still under 40 at the time of plaintiff's termination.

Shell next asserts that Mr. Green and Mr. Grieshop were not quite similarly situated.  Memorandum in Support, p. 13, Rec. Doc. 30-2.  However, Michelle Hallmark

of Human Resources (HR) seems to have considered Mr. Green and Mr. Grieshop, the two younger employees, as similarly situated to plaintiff.  DEx D, Rec. Doc. 30-7.  Ms. Hallmark states that the two were of the same grade level with plaintiff and they were his peers.  Id.  Thus, it appears that Mr. Green and Mr. Grieshop were, in fact, similarly situated to plaintiff per defendant's own standards.  Id.

Bill Hardy contends that younger employees in general, and Mr. Green and Mr. Grieshop in particular did, in fact, receive more favorable treatment than he did:  Tammy Little's restructuring introduced another layer of supervision for plaintiff, while Mr. Geen and Mr. Grieshop remained her direct subordinates (PEx #2, pp. 132-133);  plaintiff was moved to a smaller office (Id., pp. 134-135); Tammy Little consistently praised the work of younger employees during meetings, but never the work of older employees (Id., pp. 141-142); in the performance evaluation for 2006, Don Fowler stated that plaintiff's performance was not as impressive as that of Mr. Green or Mr. Grieshop (Id., p. 137).  At page 16 of its Memorandum in Support, Shell contends that Mr. Fowler's statement comparing plaintiff to two younger employees is irrelevant, because Mr. Fowler was not the final decision maker, and his comment was made one year prior to plaintiff's termination.  Rec. Doc. 30-2.  However, the comment was made as part of plaintiff's annual evaluation, which defendant admits was relied upon by Susanne Karst when she decided to terminate plaintiff.   Memorandum in Support, p. 2; Rec. Doc. 30-2. Therefore, Mr. Fowler was in a position to influence the final decision maker, which makes Shell liable for any statements or comments by Mr. Fowler indicating age discrimination.  *Parker v. State of La. Dep't of Educ. Special Sch. Dist.*, 323 Fed. Appx. 321, 328 (5th Cir. La. 2009) (grant of summary judgment reversed where the supervisor

influenced the final decision maker, even though the supervisor did not personally make the decision to remove the plaintiff).  See also *Long v. Eastfield College,* 88 F.3d 300 (5th Cir. 1996).  And the fact that Mr. Fowler's statement was made one year prior to plaintiff's termination is irrelevant, considering that Shell admittedly used that performance appraisal containing that statement as a reason to terminate plaintiff. Memorandum in Support, p. 2; Rec. Doc. 30-2.

At page 19 of its Memorandum in Support, Rec. Doc. 30-2, Shell dismisses all acts that occurred in the 2004-2006 timeframe, and which plaintiff claims to have been discriminatory, because they are prescribed.  However, Shell fails to note that such incidents, although not timely for purposes of damages, are viable as background information and circumstantial evidence to prove discrimination:

> Nonetheless, when a plaintiff must prove intentional discrimination, a district court can abuse its discretion by limiting a plaintiff's ability to show the atmosphere in which the plaintiff operated." *Kelly v. Boeing Petroleum Servs., Inc.,* 61 F.3d 350, 358 (5th Cir. 1995) (quotations omitted). Evidence of other wrongs or acts may be admissible to prove, for example, defendant's motive, intent, plan, knowledge or absence of mistake in an employment discrimination case.... acts occurring before the relevant statute of limitations period may still be admissible to prove a plaintiff's timely claim.

*Marchese v. Sec'y*, 2004 U.S. Dist. LEXIS 20680, at 4-6 (E.D. La. Oct. 12, 2004).

Of particular interest are the expectations that Shell had of plaintiff, as opposed to the expectations it had of Mr. Grieshop.  Specifically, plaintiff had the longest work lists, per Susanne Karst herself:

> Q.    ... Do you know how the length of your work list compared to the length of other employees' work lists?
> A.    No. Just what Susanne Karst told me.

| Q. | And what did Susanne Karst tell you about that? |
| --- | --- |
| A. | That I had the longest one. |
| Q. | Were there various projects on that list that were added over time? |
| A. | Yes, there were. |
| Q. | Do you remember how many projects were on the list? |
| A. | I remember the number of items on the list. |
| Q. | And what was that, the number of items? |
| A. | 98. |
| Q. | And is it fair to say that the list did not start out having 98 items on it? |
| A. | That's fair to say. |

PEx #2, pp. 204-205.   Lynette Daffin, interim manager, cites approximately 95 items, and was disappointed that plaintiff had only completed 25.  PEx #4, p. 4.  However, Mr. Grieshop, 14 years younger than plaintiff, testified that his work lists usually did not exceed five items, and if sub-parts were counted, it would total to about 50 items.  PEx #5, pp. 94-95.  Thus, it appears that the size of plaintiff's work list was approximately twice that of his similarly situated, younger peer.  Tammy Little also showed preference for the younger Mr. Grieshop in terms of promotional opportunities, wherein she told plaintiff that there was no promotion available:

| A. | Tammy Little said there would be no more Grade 2 promotions at the plant level. |
| --- | --- |
| Q. | Tell me when Tammy Little supposedly told you that. |
| A. | When we were reviewing the document that I previously filled out with Nancy Hansen which outlined all my proficiencies and where I stood in the – in my responsibilities ... but that's when she said that, you know, there wouldn't be any more promotions to job – Job Grade Level 2 at the plant level. |

PEx #2, pp. 211, 212.  Not surprisingly, this was not true as Mr. Grieshop's supervisors, past and present, including Ms. Little, told him otherwise:

> Q.    In your career discussions what have you been told
> was necessary for you to be promoted to a Grade 2
> engineer?
>
> A.    I was told the likelihood of becoming a Grade 2 was
> slim to none. Three people as far as I know at a
> location have ever made it to a Grade 2. I would
> have to support other sites and I would have to work
> on major projects, etc., so I'm -- I was the lead.
> That's been transferred to someone else for our head
> office team that works with all the olefin plants
> worldwide. I work weekly with Deer Park on
> problems that they're having. I've flown to there and
> other locations to provide support to them. There's a
> whole work list of items that would have to be
> completed. I think it's called the JG 2 or whatever
> level and there's a whole list of things are needed.
>
> Q.    Who told you this?
>
> A.    Every supervisor I've had for the last 15 years,
> when we meet for our yearly review they asked us
> what do we want to do when we grow up. You
> know, as your career develops what do you want to
> do and be, and I said I don't want to be in
> Management. I'd like to stay technical and they said
> well, you know, these are the kind of grade levels
> that are possible in being technical and so, you
> know, I said well, I'd rather do a job I like coming
> in to work for each day and be whatever job level I
> am than have a job where I'm a higher grade level
> and don't like what I do each day, so we talked
> about that kind of stuff and I knew becoming a level
> 2 was possible but it was probably not going to
> happen so I was really surprised when it did.

PEx #5, pp. 79-81.  Indeed, Mr. Grieshop was promoted to Grade 2 in 2008.  Id., p. 24.

That was the same year plaintiff was terminated.

Additional evidence of age discrimination comes from Shell's treatment of its

older employees regarding their benefits:

> Q.    And, you said something about a freeze.  What –
> what do you know about the freeze?
>
> A.    Well, the – the people in that position were so-
> called Grade 5 level.  They changed the grades to
> Grade 6 level, and they froze their salaries after

> that.  There were some maybe 20 something people
> in that position.
> ****
>
> Q.   Okay. Let's – let's deal with this one for now.  The
> change in the freeze that affected Mark Weber and
> the other group in Grade 5 that you talked about,
> why do you believe that that had something to do
> with age?
>
> A.   Because all the individuals that were in that group
> were age 50 or older.

PEx #2, pp. 34-35.  While Tammy Little denied that she had personal involvement in the

freeze, she did not deny that the freeze happened:

> Q.   Was your solution about degrading responsible for
> the 20 plus older paraprofessional workers receiving
> a demotion?
> ****
>
> THE WITNESS:
> I have no -- I had no say in corporate programs that
> were rolled out with regard to salary grades.
> ****
>
> Q.   Was this solution of yours also responsible for the
> 20 plus older paraprofessionals having their raises
> frozen for about a year later?
> ****
>
> THE WITNESS:
> I had nothing to do with that.

PEx #3, pp. 155-156.

At page 15 of its Memorandum in Support, Rec. Doc. 30-2, defendant states that

"Hardy has no reason to believe that either Karst or Little even knew of his age."  Indeed,

throughout her deposition Tammy Little denied knowing plaintiff's age, or anybody

else's age for that matter.  However, Shell surely must keep track of its employees'

retirement prospects:

> Q.   How would the plant know if there was a need to
> hire personnel if they didn't track potential retirees?
> ****
>
> THE WITNESS:

> When we talk about -- when we do planning we -- I mean, more so than anything we talk with folks about what are their career aspirations, next assignments, that kind of stuff and we'll talk in general time frames of, you know, hey, I think I want to be doing something different in a couple of years from now so that that would help us understand something different for somebody may mean retire, it may mean go do another assignment in a different location, so we talk more in the context of when is the time for you to make your next move.

PEx #3, pp. 113-114.  In fact, plaintiff's retirement was undisputedly considered and talked about by Shell management.  In an email forwarded to Ms. Little, and marked "Confidential," the following question was asked: "Is Bill retirement eligible?"  PEx #6. Defendant further acknowledged that, when Mr. Hardy complained of age discrimination, Human Resources (HR) "investigated" and that Susanne Karst was coached by Michelle Hallmark of HR regarding plaintiff's complaint.  Memorandum in Support, pp. 5-6. Further, Bill Hardy himself submitted a complaint to Susanne Karst wherein he informed her that he had previously committed to a retirement date.  PEx #7.  Therefore, even though Ms. Little or Ms. Karst may not have known plaintiff's exact age, they were both aware that he was close to attaining retirement age.

At page 18 of its Memorandum in Support, Rec. Doc. 30-2, Shell claims that nobody told plaintiff he was terminated because of his age, and there is no document stating such.  However, plaintiff is not required to produce a confession:

> It is certainly not necessary, and indeed is often impossible, for the plaintiff in a discrimination case to prove the defendant's state of mind by direct evidence. Defendants are rarely courteous enough to admit in some documented form that an asserted rationale behind a discharge is really a pretext for an illicit motive.

*Burns v. Texas City Refining, Inc.*, 890 F.2d 747, 751 (5th Cir. 1989).  See also *Moore v. McDermott, Inc.,* 494 So. 2d 1159, 1160 (La. 1986) ("Rarely will it occur, as in *Wiley v. Missouri Pacific Railroad Co.*, 430 So. 2d 1016 (La. App. 3rd Cir. 1982), that the employer will give that very reason in writing.")  Indeed, "...the question facing triers of fact in discrimination cases is both sensitive and difficult, and that there will seldom be 'eyewitness' testimony as to the employer's mental processes...."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations omitted).

It is noteworthy that Shell has not produced a statement, sworn or otherwise, from Susanne Karst, the final decision maker.  The "uncalled witness" rule mandates that, where a party fails to produce a witness whose testimony would explain or clarify the occurrence(s), the fact that the party fails to produce the witness creates a presumption that the witness's testimony would be unfavorable.  *Hernandez v. Schwegmann Giant Supermarkets*, 464 So.2d 902 (La.App. 4 Cir.,1985); *Young v. State Farm Fire & Casualty Insurance Co.,* 426 So.2d 636 (La.App., 1st Cir., 1982), *writ denied,* 433 So.2d 148, 171 (La.1983).  Although this rule "...does not arise in those instances in which the witness in question is equally available to both parties," plaintiff contends that Ms. Karst was not available to him.  Indeed, the prevailing jurisprudence denied Mr. Hardy the possibility of contacting Ms. Karst regarding his claims against Shell outside the presence of Shell's counsel.  *Jenkins v. Wal-Mart Stores*, 956 F. Supp. 695 (W.D. La. 1997).  Thus, Mr. Hardy could not secure a statement from Ms. Karst through informal means.  Further, Ms. Karst is believed to have been terminated from her employment prior to the discovery period in these proceedings.  She was no longer a represented party to be

13

subpoenaed through counsel of record, and plaintiff did not know her post-Shell whereabouts.  By contrast, Ms. Karst was available to Shell up to the time of her separation from employment, and Shell could have secured her affidavit.  Shell's failure to present the version of events of Ms. Karst, the final decision maker, creates a presumption that her testimony would not be favorable to defendant.  *Hernandez,* supra. Indeed, Ms. Karst may very well have unfavorable statements now that she is no longer an interested witness.  She, herself, was terminated around the same time the instant lawsuit was filed.  PEx #3, p. 17.  The proffered reason for Ms. Karst's termination: treating the non-degreed employees disrespectfully.  Id., p. 18.  One employee in particular who complained of Ms. Karst's treatment, according to Tammy Little, was Trevor Taylor.  Id., pp. 24-26.  Mr. Taylor also happens to be another older employee whom plaintiff identified as receiving discriminatory treatment at the hands of Shell:

> A.    Well, due to the occurrence that I mentioned and others that – that I have not mentioned yet, the Grade 5 situation and the environmental manager, what was occurring to myself, what was occurring to one of the other of my associates, and this gentlemen's name was Trevor Taylor.  He was an immigrant from Jamaica.  We were both experiencing the same sort of pressure and harassment from the immediate supervisor and the supervisor above that....

PEx #2, pp. 40-41.  Mr. Taylor was over 50.  Id.  He reported to Susanne Karst, and was subjected to the same unreasonable work lists, deadlines and reporting requirements.  Id., pp. 55-56.  Plaintiff too can recall instances of Ms. Karst's disrespectful behavior toward him.  For instance, in light of Ms. Karst's complete lack of experience in the Controls System Engineering field and analyzers, Bill Hardy offered to help:

A.     She had no experience with control systems engineering at all. She – her background was not – not in control systems engineering. This is the very first time that it had ever occurred where we ever had someone who was brought in from the street I guess to be the head of Control Systems Engineering Group with no background or experience, and initially I had talked to her and tried to explain to her the nature of the analyzer business. I had a lot of experience, published a lot of documents in the public domain. One document I published, as a matter of fact, is the third largest selling book that I contributed to – is the largest selling book with over 10,000 copies sold and in this book I described managing, maintenance – management and maintenance of analyzer systems, and I ...

****

A.     And so I asked her, please to look at this prior to making any decisions, and she did not, and I asked her – I think I told her two or three times, and one time she told me, well, I will – I'll read that when I am trying to sleep one night, can't go to sleep, but sorry to --

PEx #2, pp. 174-175. Considering Ms. Karst's disrespect was targeted at older employees, a jury should be allowed to discern whether age was a factor.

<u>Shell's articulated reason is false.</u>

Defendant claims that it terminated plaintiff, not because of his age, but because of allegedly poor work performance. Rec. Doc. 30-2, p. 2. Bill Hardy contends that the stated reason is false, and that Shell imposed unreasonable tasks and deadlines upon him in order to set him up for failure.

First, there is no evidence of any work deficiencies by plaintiff from 1989, the time he became employed by Shell, and until 2004, when Tammy Little, 20 years younger than plaintiff, became his supervisor. Second, the alleged work deficiencies

15

used to terminate Mr. Hardy were based on a work volume that was twice that of similarly situated younger employees.  PEx #2 (pp. 204-205), 4 (p. 4), 5 (pp. 94-95). Third, the evidence shows that Shell was not willing to give plaintiff any chance to explain any alleged deficiencies.  On September 13, 2007, Susanne Karst issued a written reminder outlining a meeting that took place that day between the two.   PEx #8. Presumably, that meeting was to discuss Ms. Karst's concerns and obtain plaintiff's version of events.   However, Mr. Hardy's explanations were futile, as Ms. Karst had already drafted the accusatory document before hearing what plaintiff had to say.   PEx #9.  It appears that the exact same document was originally drafted on September 12, 2007, one day prior to the meeting.  Id.  Ms. Karst had her mind made up to discipline plaintiff regardless of what was to transpire during the next day's meeting.  Id.  Fourth, plaintiff's alleged continuous pattern of poor performance is undermined by Shell's own correspondence commending Susanne Karst's team, plaintiff included, for a job well done, as well as acknowledgment of plaintiff's leadership.  PEx ##10, 11.

Shell proffers that it was sympathetic to plaintiff, as evidenced by the fact that it accommodated his need to care for his ill mother.  Memorandum in Support, p. 22; Rec. Doc. 30-2.  Shell omits to state that the leave that plaintiff was seeking, and which defendant approved, was under the Family Medical Leave Act (FMLA), which mandates:

(a)     In general.
(1)     Entitlement to leave. Subject to section 103 [29 USCS § 2613], an     eligible employee shall be entitled to a total of 12 workweeks of leave  during any 12-month period for one or more of the following:

**** 

(C)     In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

29 USCS §2612(a)(1)(C).  Provided that an employee meets the requirements set forth in

29 USCS §2612, as Bill Hardy did by caring for his mother who suffered from a serious

medical condition, entitlement to leave under the Act is mandatory:

> (a)    Interference with rights.
> (1)    Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [29 USCS §§ 2611 et seq.].

29 USC 2615 (a)(1).  Thus, Shell was required by law to allow plaintiff leave under

FMLA in order to care for his mother.  Id.  Shell did not do plaintiff any favors, nor does

obeying FMLA equate sympathy or lack of discrimination based on other protected traits,

such as age.

Bill Hardy showed a prima facie case of age discrimination, undermined the

legitimacy of Shell's articulated reason, and produced additional evidence of age-related

animus at Shell, which may lead to an inference of illegal discrimination:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."

*Reeves*, supra, at 530 U.S. 147.   Summary judgment should be denied.


### 3.   Shell retaliated against Bill Hardy because of his protected activity.

In order to make a prima facie case of retaliation, Bill Hardy must show that (1)

he participated in protected activity; (2) his employer took an adverse employment action

against him; and (3) a causal connection exists between the protected activity and the

adverse employment action.  *Donaldson v. CDB, Inc.*, 335 Fed. Appx. 494, 506 (5th Cir. Miss. 2009).   Mr. Hardy has shown every element.   He engaged in three protected activities.   The first was on April 3, 2007, when he submitted written complaint to Susanne Karst in which he was complaining of, inter alia, being constantly compared to younger employees and being subjected to harassment and a hostile work environment. PEx #7.   *Foster v. Solvay Pharms., Inc.*, 160 Fed. Appx. 385, 388 (5th Cir. 2005), found that a telephone call to the human resources department was sufficient for the plaintiff to have engaged in protected activity.   Therefore, Mr. Hardy's complaint, escalated to the HR level by Ms. Karst, amounts to protected action.   The second protected activity was in February, 2008, when he filed a Charge of Discrimination with the Equal Employment Opportunity Commission, complaining of age discrimination and retaliation.   DEx C, Rec. Doc. 30-6, pp. 11-12.   The third was on February 26, 2008, when he responded to his recent performance evaluation by stating that he was, again, discriminated against and harassed.   Rec. Doc. 30-4, p. 59. It is undisputed that Mr. Hardy suffered an adverse employment action, wherein he was terminated.   As for the causal connection Shell states, at page two of its Memorandum in Support (Rec. Doc. 30-2), that timing alone is insufficient to establish a causal connection.   While not all adverse actions that happen to occur after a protected activity amount to retaliation, those that occur in close temporal proximity may:   "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation."   *Swanson v. GSA*, 110 F.3d 1180, 1188 (5th Cir. 1997), citing *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993).  *ABF Freight Sys. v. NLRB*, 510 U.S. 317, 319, 114 S. Ct. 835, 127 L. Ed. 2d 152 (1994), found that six weeks

between the protected conduct and the termination was sufficiently close to establish a causal link.  Similarly, Bill Hardy filed his EEOC Charge on February 8, 2008.  Shell began talks of termination on February 27, 2008, and drafted the termination letter a month later.  PEx #12.  Less than three weeks elapsed between plaintiff's protected activity of February 8, 2008, and Shell's initiation of termination discussion on February 27, 2008.  In fact, only one day elapsed between Shell's termination initiation and plaintiff's February 26, 2008, protected activity.  Rec. Doc. 30-4, p. 59.  Timing as close as a few hours undisputedly satisfies the causal connection element of the prima facie case:

> Here, it is undisputed that Dr. Rikabi set forth a prima facie case of retaliation: (1) he engaged in protected activity; (2) he experienced a significant and sudden drop in his workload at the Center; and (3) this action occurred almost immediately following his protected activity.

*Rikabi v. Nicholson*, 262 Fed. Appx. 608, 611 (5th Cir. 2008).

Bill Hardy has more than timing.  He has Susanne Karst's own statement that plaintiff should not challenge her reprimands.  When he told her that he felt singled out and that others were joining her in the attitude, Ms. Karst's response was:  "I suggested that he remove the 'bandwagon' explanation from his logic and consider SGS analyzer discipline comments at face value."  PEx #13.  *Fallon v. Potter*, 277 Fed. Appx. 422, 428 (5th Cir. La. 2008), reversed a lower court's grant of summary judgment on the plaintiff's retaliation claim, where the supervisor told the employee to drop her EEOC charges.  Similarly, Susanne Karst told Bill Hardy to cease his complaints of discrimination and accept the reprimands "at face value."  PEx #13.  Such a statement may dissuade a

reasonable employee from pursuing his or her rights per *Burlington Northern & Santa Fe Ry. v. White*, 548, U.S. 53, 126 S. Ct. 2405 (2006).

## **CONCLUSION**

Plaintiff met his prima facie case of discrimination.  He is a member of the protected class, as he was 59 at the time of his termination.  He suffered an adverse employment action, and similarly situated younger employees were treated more favorably than was he.  The two main supervisors favoring younger employees were themselves 20, and approximately 15, years younger than plaintiff, respectively. Defendant's articulated reason for terminating plaintiff is false which, coupled with plaintiff's prima facie case, may "...suffice to show intentional discrimination."  *Reeves*, supra, at 530 U.S. 147.  Also, Bill Hardy was retaliated against due to his complaints of age discrimination made first internally in April of 2007, and then to a federal agency on February 8, 2008.  Within weeks of his federal complaint his supervisors began talking about his termination.  The close timing of his adverse action may show the causal connection between his protected activity and his termination.  *Swanson,* supra, at 1188; *Fallon,* supra, at 425-426.  The supervisor's suggestion that plaintiff should stop complaining and accept the discipline at face value is additional evidence of defendant's retaliatory tactics.  *Id,* supra, at 428-429.  Therefore, based on the evidence and the law applicable thereto, summary judgment should be denied.

Respectfully submitted by,

/s/ Dan M. Scheuermann
Dan M. Scheuermann (#11767)
600 America Street
Baton Rouge, LA  70802-5903
Telephone:  225-344-9381
Facsimile:  225-344-9384
Email:  dan@dmsattorney.com
*Attorney for plaintiff,*
*William Hardy*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed with the Court via the

Electronic Filing System, and that a copy thereof is being served upon defendant, via the

Court's Electronic Notification System.

Baton Rouge, LA, this 28th day of January, 2010.

/s/ Dan M. Scheuermann
Dan M. Scheuermann